IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ED LOYHA,

        Plaintiff,                      No. CIV S-09-0038 GGH

    vs.

MICHAEL J. ASTRUE,           ORDER
Commissioner of
Social Security,

        Defendant.
                                  /

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") finding that her disability had ceased in December, 2003, and terminating her Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. For the reasons that follow, plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

BACKGROUND

        Plaintiff, born April 5, 1958, applied on April 24, 1991for disability benefits. (Tr. at 34.) Plaintiff alleged she was unable to work due to headaches, neck pain, and a personality disorder. (Tr. at 34, 176.) Plaintiff was found disabled by an ALJ on December 13, 1993;

1

however, on December 12, 2003, the Commissioner determined that plaintiff was no longer disabled. (Tr. at 183-86.) A hearing on the cessation decision resulted in a denial on April 19, 2005. (Tr. at 14-20.) This decision was upheld on appeal. (Tr. at 6-8.) After plaintiff filed for relief with the district court, her case was remanded to the ALJ on May 30, 2007, for further proceedings. (Tr. at 528-39.) On remand, the second ALJ decision, issued October 22, 2007, again found that plaintiff was no longer entitled to benefits. (Tr. at 440-52.) The Appeals Council then remanded for submission of further evidence and/or argument, and to obtain vocational testimony regarding the effect of the assessed limitations on plaintiff's occupational base. (Tr. at 479-80.)

        In a decision dated August 25, 2008, ALJ Stanley R. Hogg determined plaintiff was no longer disabled. The ALJ made the following findings:[1]

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

    Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

    Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

    Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

    Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

    Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the

1. The most recent favorable medical decision finding that the claimant was disabled is the determination dated December 10, 1993. This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, the claimant had the following medically determinable impairment: personality disorder. This impairment was found to meet section(s) 12.08 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)).

3. The medical evidence establishes that, as of December 12, 2003, the claimant had the following medically determinable impairments: depressive disorder not otherwise specified and arthralgias of the right shoulder, lower back and bilateral knees. These are the claimant's current impairments.

4. Since December 12, 2003, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

5. Medical improvement occurred as of December 12, 2003 (20 CFR 416.994(b)(1)(i)).

6. The medical improvement is related to the ability to work because, as of December 12, 2003, the claimant no longer had an impairment or combination of impairments that met or medically equaled the same listing[] that was met at the time of the CPD (20 CFR 416.994(b)(2)(iv)(A)).

7. Beginning on December 12, 2003, the claimant's impairments have continued to be severe, but considerably less severe tha[n] found at the comparison point decision (20 CFR § 416.994(b)(5)(v)).

8. After careful consideration of the entire record, the undersigned finds that, beginning on December 12, 2003, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). Additionally, due to mild to moderate depression, the claimant is limited to unskilled work which requires only one, two or three step instructions. She is also unable to work at jobs which require working with the public.

9. The claimant has no past relevant work (20 CFR 416.965).

---

burden if the sequential evaluation process proceeds to step five. Id.

| | | |
|---|---|---|
| | 10. | On December 12, 2003, the claimant was a younger individual age 18-44 (20 CFR 416.963). |
| | 11. | The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English. |
| | 12. | Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968). |
| | 13. | Beginning on December 12, 2003, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 416.960(c), and 416.966). |
| | 14. | The claimant's disability ended on December 12, 2003, and the claimant has not become disabled again since that date (20 CFR 416.994(b)(5)(vii)). |

(Tr. at 419-31.)

Therefore, the question is whether the ALJ's decision that plaintiff's disability ended on December 12, 2003, was proper. Where plaintiff was previously awarded disability benefits, there is a presumption of continuing disability. <u>Bellamy v. Secretary of Health & Human Services</u>, 755 F.2d 1380, 1381 (9th Cir. 1985), citing <u>Murray v. Heckler</u>, 722 F.2d 499, 500 (9th Cir. 1983). It is the Secretary's burden to come forward with evidence to rebut this presumption. <u>Id.</u> To determine medical improvement, the Secretary "compare[s] the current medical severity of that impairment(s) which was present at the time of the most recent favorable medical decision that [plaintiff was] disabled or continued to be disabled to the medical severity of that impairment(s) at that time." 20 C.F.R. § 404.1594(b)(7). The comparison point date ("CPD") is compared to the plaintiff's present condition.

<u>ISSUES PRESENTED</u>

Plaintiff has raised the following issues: A. Whether the ALJ Rejected Work-Related Functional Limitations Which He Purported to Adopt; and B. Whether the ALJ Failed to Properly Assess Plaintiff's RFC and Pose a Legally Adequate Hypothetical to the Vocational

4

Expert.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

ANALYSIS

A. Whether the ALJ Rejected Work-Related Functional Limitations Which He Purported to Adopt

Plaintiff contends that the ALJ purported to rely on Dr. Daigle's opinion; yet he failed to adopt all of the functional limitations recommended by this psychiatrist. Plaintiff further contends that the ALJ completely ignored the limitation to occasional bending by Drs. Ellis and Selcon, despite his reliance on these internists in regard to plaintiff's physical limitations.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246

\\\\\

\\\\\

\\\\\

5

F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2]  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

        To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester , 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.

---

[2] The regulations differentiate between opinions from "acceptable medical sources" and "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist  for weighing opinions from "other sources."  Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

[3] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

> The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990); Gallant v. Heckler, 753 F.2d 1450 (9th Cir. 1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. .... And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.

Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1996). The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Id. at 831.

Reviewing administrative decisions involving mental/emotional illness are akin to wrestling with shadows. In rejecting the opinions of mental illness clinicians, the ALJ will opine that objective evidence of the asserted mental problem is lacking as if there were diagnostic tools available such as a "depression X-ray." On the other hand, basing lifetime disability decisions essentially on the subjective statements of a person with an incentive to exaggerate seems hardly a wise or meaningful way to determine real mental disability.[4] Various psychiatrists often disagree on the nature and severity of the claimant's afflications, and such is the case here. Thus, after the wrestling match, aka analysis, one feels as if he was not able to come to grips with facts necessary for a correct decision. One does the best he can.

In this case, the ALJ gave greater weight to the most recent psychiatrist's opinion, that of Dr. Daigle, who examined plaintiff on February 9, 2006. He noted her reported history of depression for ten years due to pain all over her body, but also noted that she had not received treatment or medication for depression, and that "her history of psychiatric attention is rather sketchy." (Tr. at 701.) Dr. Daigle diagnosed "depressive disorder, NOS, untreated," "no

---

[4] It should be noted that the ALJ found plaintiff to be not totally credible, and plaintiff has not contested this finding. (Tr. at 426.)

7

psychiatric diagnosis," "complaints of physical injuries and chronic pain," and a GAF of 55.[5] (Id. at 703.) This psychiatrist thought plaintiff's prognosis was fair based on her poor education, limited experience, and limited acculturation, but that it would improve with medication and therapy. In regard to plaintiff's functioning, Dr. Daigle opined that plaintiff was not significantly limited in understanding, remembering and carrying out simple 1 or 2 step job instructions. She was slightly limited in following detailed and complex instructions. She was slightly limited in her ability to relate to and interact with co-workers and the public. She was moderately limited in maintaining concentration, attention, persistence and pace, and in maintaining attendance and safety. She was moderately limited in her ability to adapt to stresses in the work environment. She could handle her own funds. (Id. at 704.)

Plaintiff asserts that the ALJ's RFC determination, despite crediting Dr. Daigle, did not include all these limitations. An ALJ may properly rely upon only selected portions of a medical opinion while rejecting other parts. See, e.g., Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ's supported reliance on selected portions of conflicting opinion constitutes substantial evidence). However, such selective reliance must be consistent with the medical record as a whole. See, e.g., Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001) (ALJ cannot reject portion of medical report that is clearly reliable).

Social Security Ruling 96-8p sets forth the policy interpretation of the Commissioner for assessing residual functional capacity. SSR 96-8p. Residual functional capacity is what a person "can still do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

---

[5] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. rev. 2000) ("DSM IV"). According to the DSM IV, a GAF of 51- 60 indicates moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks, or moderate difficulty in functioning as in few friends or conflicts with peers or co-workers.

Although the ALJ was not required to rely on every limitation imposed by Dr. Daigle, his limitation of plaintiff to light unskilled work which requires only one, two or three step instructions and no contact with the public, encompassed all of Dr. Daigle's limitations. SSR 85-15 states:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

Such jobs "ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis." Id. Unskilled work involves little or no judgement to do simple duties that can be learned on the job in a short period of time. This is in contrast to semi-skilled or skilled work which may require alertness, close attention, or coordination and dexterity to do repetitive tasks quickly. 20 C.F.R. § 404.1568.

Although the ALJ was not required to adopt all the limitations imposed by Dr. Daigle, defendant's reference to Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007), supports the ALJ's limitations or lack thereof. The plaintiff in that case was moderately limited in his ability to maintain attention, concentration, persistence and pace, maintain regular attendance, to perform at a consistent pace, and "to complete a normal workday and workweek without interruption from psychologically-based symptoms," as is the plaintiff in this case. The court held that such moderate limitations would not significantly limit plaintiff's ability such that vocational testimony was required. Id. Here, the ALJ did not view plaintiff's condition to be not significant as did the court in Hoopai; but rather he did limit plaintiff to unskilled work with only one, two or three step instructions and to jobs not requiring working with the public. (Tr. at 424.)

\\\\\

1         Plaintiff cites to Program Operations manual at DI 25020.010 for the proposition
2   that certain mental abilities are critical in performing unskilled work, including maintaining
3   regular attendance, punctuality, completing a normal workday and workweek without
4   interruption, accepting instructions, responding appropriately to criticism and getting along with
5   coworkers.  Nevertheless, the Ninth Circuit in Hoopai has held that moderate limitations in these
6   abilities are not sufficiently severe non-exertional limitations to warrant departure from the grids,
7   and its authority is binding.

8         Plaintiff's other claim is that the ALJ ignored Dr. Ellis' limitation to occasional
9   bending, and failed to include it in his hypothetical to the expert.  As a general proposition,
10  although the ALJ is not required to discuss every piece of evidence, the record does need to
11  demonstrate that he considered all of the evidence.  Clifton v. Chater, 79 F.3d 1007, 1009-10
12  (10th Cir. 1996) (finding ALJ's summary conclusion that appellant's impairments did not meet or
13  equal any Listed Impairment was a bare conclusion beyond meaningful judicial review).  In this
14  case, the limitation to light work encompasses any limitation to occasional bending.

15        Most light jobs require no crouching and only occasional (very little up to one
16  third of the time) stooping.[6]  SSR 83-14.  See also SSR 85-15, *7 (ability to occasionally stoop or
17  crouch leaves the light occupational base virtually intact).  Because light work involves frequent
18  carrying of up to ten pounds, it implicitly requires "occasional bending of the stooping type; i.e.,
19  for no more than one-third of the workday..." SSR 83-14, *4.  See also SSR 83-10 (noting that
20  majority of light work jobs can be done with occasional rather than frequent stooping).  Because
21  light work usually requires occasional stooping, any limitation on this ability must be considered
22  very carefully for a determination of its impact on the remaining occupational base of light work.
23  SSR 83-14 at *4.  If the occupational base is significantly eroded, such as where a plaintiff is
24  completely unable to perform a nonexertional activity such as crouching, a vocational consultant

---

[6] "Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist."  SSR 83-10.

10

may be necessary.  Iannopollo v. Barnhart, 280 F. Supp.2d 41, 50 (W.D. N.Y. 2003).

Despite the fact that the ALJ did not limit plaintiff to occasional bending in his hypothetical, the jobs identified by the vocational expert can be analyzed here to determine whether more than occasional bending is required and the Dictionary of Occupation Titles indicates that the jobs of sewing machine operator and small parts operator require no stooping. Dictionary of Occupational Titles 786.685-030; 739.687-030.[7]  The job of housekeeper requires only occasional stooping, and is in keeping with Dr. Ellis' limitation.  DOT 323.687-014. Therefore, there was no error by the ALJ in failing to include a bending limitation in his hypothetical to the expert.

B.  Whether the ALJ Failed to Properly Assess Plaintiff's RFC and Pose a Legally Adequate Hypothetical to the Vocational Expert

Some aspects of plaintiff's contention that the ALJ erred in posing a hypothetical to the expert that did not include the limitations set forth above have been discussed in the previous section.

Hypothetical questions posed to a vocational expert must include all the substantial, supported physical and mental functional limitations of the particular claimant. Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d 789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the expert's testimony as to available jobs in the national economy has no evidentiary value. DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d

---

[7] The United States Dept. of Labor, Employment & Training Admin., Dictionary of Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy." Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990).  The DOT classifies jobs by their exertional and skill requirements.  It is used by the SSA to classify jobs as skilled, unskilled, or semiskilled.  (Id.)  Each job is assigned a number reflecting how long it generally takes to learn the job, termed "specific vocational preparation" ("SVP") time.  (Id.)  The DOT is a primary source of reliable job information for the Commissioner.  20 C.F.R. § 404.1566(d)(1).

947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, substantial evidence must support the hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).[8]

As a preliminary matter, it should be clarified that the R level referred to by the VE pertained to the Reading Level, because the ALJ had just inquired about the language and then the reading requirement.  (Tr. at 844-45.)  The VE responded that the reading level was 2 for the sewing machine operator job, which is accurate.  See DICOT 786.685-030 ("Language: Level 2 - READING").  The small parts and housekeeper jobs had a reading level of 1.  See 739.687-030 ("Language: Level 1 - READING"), 323.687-014 ("Language: Level 1 - READING").  The expert correctly answered the ALJ's questions on this subject.

Plaintiff asserts that although the ALJ stated that "pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles," he never asked the expert whether it was consistent.

This circuit has found that the DOT does not necessarily control over vocational expert testimony.  Johnson v. Shalala, 60 F.3d 1428, 1436 (9th Cir.1995) ("It was . . . proper for the ALJ to rely on expert testimony to find that the claimant could perform the two types of jobs the expert identified, regardless of their [DOT] classification").  The ALJ may not rely on a vocational expert's testimony without first inquiring whether the testimony conflicts with the DOT.  Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007).

---

[8] Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel." Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial evidence or reject them if they are not.  Id. at 756-757.

Plaintiff's argument is without merit as there was no conflict between the DOT and the vocational expert. Furthermore, the VE specifically spoke to plaintiff's language, reading, and math skills, specific vocational preparation, and that they equate to level 2 or less, depending on the job. (Tr. at 844-46.) See Massachi, 486 F.3d at 1154 n. 19 (failure harmless if no conflict between vocational opinion and DOT or if VE provides sufficient support for conclusion that justifies any potential conflicts).

In regard to reasoning levels, the sewing machine operator and small parts assembler jobs contain reasoning levels of 2 which is defined as "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DICOT 786.685-030, 739.687-030. The housekeeper job has a reasoning level of 1 which is defined as "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." DICOT 323.687-014. Here, the limitation to unskilled work which requires only one, two or three step instructions[9] must be reconciled with the various reasoning levels of the jobs assigned by a vocational expert. Rather than adhere to a strict construction of what this limitation equates to in terms of reasoning level, this court prefers to follow the well developed reasoning of the Central District in Meissl. There, the plaintiff was found to be limited to "simple tasks performed at a routine or repetitive pace." Id. at 982. The court explained that although the Social Security Regulations contained only two categories of abilities in regard to understanding and remembering instructions, either "short and simple" and "detailed" or "complex,' the DOT had many more gradations for measuring this ability, and there were six gradations altogether. Id. at 984. For example, level 2 requires application of "commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with

---

[9] This limitation was based on the report by Dr. Walter. (Tr. at 839.)

13

problems involving a few concrete variables in or from standardized situations." DICOT, App. C. The court continued:

> To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Meissl, 403 F. Supp.2d 981, 984 (C.D. Cal. 2005).

Furthermore, the use of the term "uninvolved" along with the term "detailed" in the DOT qualifies it and refutes any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term. Id. The court found that the plaintiff's RFC must be compared with the DOT's reasoning scale. A reasoning level of one requires slightly less than simple tasks that are in some sense repetitive. For example, they include the job of counting cows as they come off a truck. A reasoning level of two would encompass an RFC of being able to do "simple and routine work tasks." Id.

The VE was asked about reasoning levels, but responded by discussing SVP levels.[10] (Tr. at 845-46.) Nevertheless, the reasoning levels of the jobs which the vocational expert testified that plaintiff could do are not in conflict with the limitation to simple unskilled work which requires only one, two or three step instructions as described by Dr. Walter.

In regard to the vocational expert's testimony about level 1 math and plaintiff's inability to perform at this level, it does appear that all three jobs were designated level 1 in math, and required the ability to "[a]dd and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and

---

[10] SVP levels should not be confused with reasoning levels as these are two separate vocational considerations. SVP levels do not address whether a job involves only simple or less than complex tasks. Meissl v. Barnhart, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005).

pound." DICOT 739.687-030, 786.685-030, 323.687-014.

        The record contains inconsistent opinions regarding mathematical ability. Dr. Joyce indicated that plaintiff did not have the ability to manage funds in her own best interest based on her limited math skills. (Tr. at 298.) The ALJ did not include this limitation in his hypothetical. An ALJ may properly rely upon only selected portions of a medical opinion while rejecting other parts. See, e.g., Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ's supported reliance on selected portions of conflicting opinion constitutes substantial evidence). However, such selective reliance must be consistent with the medical record as a whole. See, e.g., Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001) (ALJ cannot reject portion of medical report that is clearly reliable). Here, the ALJ was not required to include this limitation as the physicians upon whom he relied did not limit plaintiff's math ability. Dr. Daigle specifically noted that plaintiff was capable of managing her own funds. (Tr. at 704.) Although Dr. Regazzi found that plaintiff was incapable of basic counting principles, this psychologist was rejected by the ALJ, and plaintiff does not contest this failure to fully credit this practitioner. After reviewing Dr. Daigle's and Regazzi's contradicting statements about managing her own funds, Dr. Walter testified that plaintiff can add and subtract and remember numbers. (Tr. at 838.) Dr. Solimon agreed with Dr. Joyce that plaintiff could not manage her own funds; (id. at 671), however, the ALJ was aware of all these inconsistencies and chose to rely on the opinions of Drs. Walter and Daigle after a full discussion on the issue. (Id. at 423.)

        In regard to language level, the jobs of small products assembler and housecleaner require a reading level of 1 in the DOT which contains the following definition: "[r]ecognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers." DOT 739.687-030, 323.687-014. The job of sewing machine operator contains a reading level of 2, defined as: "[p]assive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for

15

meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes."

After testifying to these reading levels, the vocational expert testified that very minimal reading was required and no talking was required for any of the jobs. (Tr. at 844-45.) Reading level 1 would be equivalent to a first to third grade level, and reading level 2 equates to a fourth to sixth grade level. (Id.) The VE testified that although some of the jobs had level 2 reading levels, an illiterate person could be taught to do the job by demonstration or through on the job training rather than through verbal instruction. (Id. at 845-46.) The ALJ reiterated this opinion in his findings. (Id. at 431.) The undersigned finds no inconsistency between the reading levels and the vocational consultant's assessment that plaintiff could learn these jobs through demonstration. The ALJ could properly rely on this portion of the vocational assessment.

CONCLUSION

Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is denied, the Commissioner's Cross Motion for Summary Judgment is granted, and judgment is entered for the Commissioner.

DATED: 07/09/2010                                    /s/ Gregory G. Hollows

                                                     GREGORY G. HOLLOWS
                                                     U.S. MAGISTRATE JUDGE

GGH/076
Loyha0038.ss.wpd